UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

KENNETH F. PHILLIPS, derivatively on behalf of
VBENX CORPORATION and derivatively on behalf of
CFN AGENCY, INC., a wholly owned subsidiary of
YouDecide.com, Inc.,

        Plaintiff,

    v.

WALTER SMITH, PETER MARCIA,

        Individual Defendants,

VBENX CORPORATION, YOUDECIDE.COM, INC.,
CFN AGENCY, INC.,

        Nominal Defendants.

Civil Action No. 17-cv-11697-MGM

## MEMORANDUM IN SUPPORT OF MOTION
## PURSUANT TO RULE 23.1 TO DISQUALIFY KENNETH F. PHILLIPS

Defendants, Walter Smith and Peter Marcia, respectfully submit this memorandum in
support of their motion, pursuant to Rule 23.1 of the Federal Rules of Civil Procedure, to
disqualify Kenneth F. Phillips from pursuing this matter.

### Preliminary Statement

To borrow a phrase, here is "the rest of the story" – a very ironic one.  On May 30, 2017,
a jury in the Business Litigation Session of Suffolk Superior Court found Phillips liable for
aiding and abetting breaches of fiduciary duty to VBenx, the parent company he purports to
represent here, and VBenx shareholders.  The jury also found Phillips liable for malicious
prosecution against Smith and Marcia.

The verdict was rendered on counterclaims asserted by Smith, Marcia, and others in a lawsuit that Phillips and J. Brent Finnegan, VBenx's former Chairman, filed on September 4, 2009, over eight years ago.  The lawsuit was part of a broader effort by Phillips and Finnegan to seize control of VBenx, and the claims Phillips and Finnegan asserted were based on factual allegations that Phillips and Finnegan knew to be false.

Phillips and Finnegan's claims were tried first, to Judge Peter M. Lauriat, jury waived, in April through June 2011.  In October 2012, Judge Lauriat handed Phillips and Finnegan a resounding and unsurprising defeat.  The Appeals Court affirmed in August 2015.

Attention then turned to the counterclaims, and they were tried in May 2017.  The jury handed Phillips and Finnegan a second resounding and unsurprising defeat.  Judgment on the verdict has entered – Phillips is liable under it to Smith, Marcia, the Company, and two others for over $1.5 million.

Whether a would-be derivative plaintiff is qualified for this role is a multi-factor analysis.  One factor is whether there is antagonism, including economic, between the would-be derivative plaintiff and the other shareholders.  Given the judgment and its history, such antagonism exists here in spades.  Another factor is whether other litigation between the would-be derivative plaintiff and the defendants is pending.  Here, there is such litigation.  Another factor is the would-be derivative plaintiff's vindictiveness toward the defendants.  Phillips's ill-will toward Smith and Marcia is unquestionable, and documented.  A further factor is the degree of support from other shareholders.  Phillips owns only 2% of the Company's shares.  Smith and Marcia own most of the shares (and thus had tremendous incentive not to do that which they are accused of), and the few other shareholders are nowhere in sight.  Phillips seemingly has no

support.  Finally, the qualifications of the would-be derivative plaintiff's counsel are to be

considered.  Phillips has selected his son to represent him, and his son is, at best, unqualified.

Because so many of the relevant factors weigh against him, Phillips is not qualified to pursue this

case.

## The Facts[1]

**The Company and the Principals**

VBenx Corporation ("VBenx" or "the Company") is a Delaware corporation

headquartered in Duluth, Georgia.  VBenx does business as YouDecide.  YouDecide sets up and

operates dedicated Internet-accessible portals for businesses.  Through the portals, the

businesses' employees can get information on and buy voluntary benefits such as home, auto,

and pet insurance, and access other products and services, such as discount buying programs.

YouDecide makes money mostly from commissions paid by insurers.  (Smith Dec., ¶¶ 7-8.)

Defendant Peter Marcia lives in Richmond, Virginia.  Marcia has been the CEO and a

Board member of VBenx at all relevant times, and he is a shareholder.  Marcia received no

regular salary or other compensation (other than expense reimbursement) from the Company

until approximately November 2011.  (Smith Dec., ¶¶ 11-12.)

Defendant Smith lives in the Glenn Allen, Virginia.  He became involved with the

Company in early 2009, and was added to the Board in or about March 2009.  He is a

shareholder.  Despite extensive work for it, Smith has never received any salary or compensation

from the Company.  (Smith Dec., ¶¶ 5, 9-10.)

---

[1]  The statement of facts is supported by the declarations of Walter L. Smith and David B. Chaffin, filed herewith.

Plaintiff, Kenneth F. Phillips, lives in Natick, Massachusetts.  He is a shareholder of VBenx.  Phillips was removed from the Board in March 2009.  (Smith Dec., ¶ 15.)

Richard Baker (a non-party) lives in Jamaica Plain.  Baker was a member of the Board of the Company until June of 2012.  Baker's wife owns shares of the company.  (Smith Dec., ¶ 13.)

J. Brent Finnegan (a non-party) lives in Boston, and has homes elsewhere.  Finnegan was the Chairman of the Board of the Company until January 2010.  Finnegan and/or his wife, Karen, own shares of the Company.  (Smith Dec., ¶ 14.)

Salvatore Percia (a non-party) is a Florida resident.  Percia is a shareholder of VBenx. Percia was removed from the Board in March 2009.  (Smith Dec., ¶ 16.)

Phillips and Percia are long-time friends and worked together elsewhere for years. (Smith Dec., ¶ 16.)

**Events Of The First Six Months Of 2009**

Smith began to take an active role with VBenx in or about February 2009.  One of the first things on which he worked was the implementation of a directive from Finnegan, Marcia, and Baker, who owned most of the Company's shares, that Phillips and Percia be removed from the Board.  Finnegan wanted them removed:  He and Marcia had been keeping the Company afloat through personal loans, and Finnegan expressed repeatedly his dissatisfaction with the fact that Phillips and Percia were not contributing financially or otherwise to the Company.  Further, reports surfaced that Phillips had undermined a Company effort to sign up Harvard University as

4

a client of the Company.  Finnegan wanted to sue Phillips, but Smith recommended against it

due to, among other things, the cost.[2]  (Smith Dec., ¶¶ 17-19)

As of mid-2009, the Board of Directors of the Company (due to the removal of Phillips

and Percia) comprised Finnegan (Chairman), Marcia, Baker, and Smith.  (Smith Dec., ¶ 20.)   As

of mid-2009, ownership of the Company's shares was as follows:

| Shareholder | Ownership | |
|---|---|---|
| | # | % |
| Barbara Pond (Wife of Baker) | 225,000 | 6.63 |
| The Finnegans | 1,330,346 | 39.18 |
| Peter Marcia | 1,262,913 | 37.20 |
| Sal Percia | 254,289 | 7.49 |
| Ken Phillips | 225,000 | 6.63 |
| Walter Smith | 0 | 0 |
| Employees | 97,500 | 2.87 |

(Smith Dec., ¶ 21.)

**The Shareholder Dispute – Chapter 1**

On July 13, 2009, Marcia told Finnegan that he intended to terminate Brooks Finnegan's

employment with the Company, or at least stop paying him.  Brooks Finnegan is J. Brent

Finnegan's son.  Finnegan was outraged.  He reached out to Phillips for assistance – an odd

choice for an ally:  Phillips had not been involved in the Company, and in the preceding year,

Finnegan had referred to Phillips in writing as a "pathological liar," had voted him off the Board,

---

[2] Eventually, a claim was brought against Phillips (in the litigation discussed below) based on what he reportedly had done.  A Harvard representative was deposed, and she confirmed that Phillips, while still a director of VBenx, had attempted to dissuade her from hiring VBenx.  She also said, however, that his comments had not influenced her decision, and, there being no causation, the claim was dropped.  In that same litigation, Phillips produced documents showing that, unbeknownst to others at VBenx, he (through his separate company, BCA) was competing with VBenx, in conjunction with another insurance brokerage firm, Willis, for Harvard's business.  (Smith Dec., ¶ 19, Ex. A.)

had sought to buy him out of the Company, and had urged a lawsuit against him.  (Smith Dec., ¶¶ 22-25.)

During the ensuing ten or eleven days, Phillips and Finnegan secretly came up with a plan to seize control of Company management and alter its business.  As Judge Lauriat later found, they intended to fire Marcia and Smith and take over VBenx, on the stated but pretextual basis of its poor financial performance, and to resist any calls or claims from other shareholders challenging the propriety of their actions.  (Smith Dec., ¶ 26.)

In furtherance of their plan, on July 24, 2009, a notice of a purported Board meeting on July 27, 2009, in Boston, went out.  An agenda for the meeting was issued the next day.  Smith read the agenda and immediately realized that Finnegan and Phillips intended to take over and fire Marcia.  The agenda said nothing about any role for Smith, which he found disturbing because by this time he had loaned $400,000 to the Company to keep it afloat, and had been working full time, for free, to build the business.  (Smith Dec., ¶¶ 27-28.)

Smith quickly advised Marcia that they should convert their Company debt (each of them had loaned about $400,000 to the Company on a convertible basis) to shares, which they did, at an agreed-upon, approved, and fair price (as later found by Judge Lauriat).  The conversions gave Marcia and Smith voting control.  (Smith Dec., ¶¶ 29-30.)  The following chart shows ownership both before and after the conversions:

| Shareholder | Pre-Conversion | | Post-Conversion | |
|---|---|---|---|---|
| | # | % | # | % |
| Baker | 225,000 | 6.63 | 225,000 | 2.90 |
| Finnegan | 1,330,346 | 39.18 | 1,330,346 | 17.14 |
| Marcia | 1,262,913 | 37.20 | 3,477,335 | 44.79 |
| Percia | 254,289 | 7.49 | 254,289 | 3.27 |
| Phillips | 225,000 | 6.63 | 225,000 | 2.90 |
| Smith | 0 | 0 | 2,153,571 | 27.74 |

19747769v.1

| Employees | 97,500 | 2.87 | 97,500 | 1.26 |

(Smith Dec., ¶ 30.)  The meeting went forward on July 27, 2009, but Finnegan and Phillips were unable to implement their plan because they no longer had control.  (Smith Dec., ¶ 31.)

**The Shareholder Dispute – Chapter 2**

Unfortunately, this did not stop them.  Instead, they developed and implemented a new, two-part strategy to seize control:  As has now been found, they filed and pursued, for six years, bad faith and wasteful litigation aimed at invalidating Marcia's and Smith's holdings, and they resorted to financial pressure tactics designed to gain control of the Company through default and foreclosure.  (Smith Dec., ¶ 32.)

**The Financial Pressure**

In August 2009, Finnegan and Phillips secretly formed an LLC called Back Bay Ventures, used Back Bay as a vehicle to purchase the Company's $1 million loan with Baytree Bank of Chicago, and promptly began to use their newly-acquired creditor status to pressure the Company.  Phillips was the architect of this strategy; he laid it out to Finnegan in an August 2009 email:

> Here are the steps:
> 1.   Contact Peter Rizzo Baytree Bank . . . (KBP [Kenneth B. Phillips] left
>       message and sent email this AM.
> 2.   Tell Rizzo KBP is representing Mr. Finnegan personally, and is making a
>       "confidential inquiry" on behalf of Mr. Finnegan who wants to have
>       greater control over his collateral  . . .  Emphasis 'confidential'.
> 3.   Ask for Copy of NOTE ASAP.
> 4.   Retain Bankruptcy Attorney . . .
> . . .
> 7.   Prepare a Term Sheet for Baytree . . .
> 8.   Prepare for closing
> 9.   Close on Note

> Structure process of 'Foreclosure' directed by Adrian and operated by KFP, in Atlanta (where the Company's administrative offices are located) etc.  Begin process, present note, negotiate after process has completed.

Kenneth B. Phillips – Phillips's counsel in this action – was intimately involved in this process: He formed Back Bay for Phillips and Finnegan, became its manager, and used it to purchase the Baytree loan from Baytree (using principally funds from Finnegan).  (Smith Dec., ¶¶ 33-36, Ex. B.)

The purchase of the loan was kept secret from Marcia, Baker, and Smith until after the transaction closed.  After that, however, the communication started to flow.  Within a month, Kenneth B. Phillips declared the Company in default on the loan; he also made all sorts of demands for additional collateral and documentation, increased the interest rate, and began to pursue "foreclosure."  His father – Kenneth F. Phillips, the plaintiff in this case – was directly involved in all of this, as is well-documented.  The Company was in very poor financial condition, and Phillips and Kenneth B. Phillips knew it.  (Smith Dec., ¶¶ 37-38.)

**The Lawsuit's Start**

On September 4, 2009, Phillips and Finnegan went to work on the other prong of their two-pronged strategy:  They filed an action in Suffolk Superior Court, alleging, among other things, that Baker, Marcia, and Smith had breached their fiduciary duties in connection with the conversions of debt to equity, and sought damages and invalidation of the conversions.  In brief, and as the Superior Court jury recently found, the material allegations of Phillips and Finnegan's complaint were false, and they knew it.  (Smith Dec., ¶ 39.)

8

**More Financial Pressure**

On January 11, 2010, Finnegan made a demand that the Company pay him, within five business days, on "twelve (12) promissory notes . . . issued to [him] by VBenx Corporation . . .." Attached to the demand was a spreadsheet listing the 12 alleged promissory notes. Most of them did not exist. The amount demanded was over $400,000 that the Company did not have, as Finnegan knew. (Smith Dec., ¶ 40.) D. Michael Sherman, an individual who no longer is involved in the Company, offered to buy Finnegan's "notes" at face value and then convert the "notes" to Company stock at $0.1575 per share. Marcia, Baker, and Smith accepted Sherman's offer. As a result (and due to a subsequent conversion of another loan and employee departures), the ownership of the Company became:

| Shareholder | # | % |
|---|---|---|
| Baker | 225,000 | 2.00 |
| Finnegan | 1,330,346 | 11.81 |
| Marcia | 3,477,335 | 30.86 |
| Percia | 254,289 | 2.26 |
| Phillips | 225,000 | 2.00 |
| Smith | 3,009,974 | 26.72 |
| Employee | 32,500 | .29 |
| Sherman | 2,744,598 | 24.36 |

Marcia, Baker, and Smith also voted Finnegan off the Board. (Smith Dec., ¶¶ 41-42.)

In early 2010, the former Baytree and then Back Bay loan was coming due. Kenneth B. Phillips, as Back Bay's manager and lawyer, was asked to provide a pay-off figure, which he did. The figure included principal plus substantial amounts for default-rate interest and his legal fees purportedly incurred in servicing the loan. The Company rejected his figure and paid Back Bay the amount the Company calculated was due. (Smith Dec., ¶ 43.) On many occasions after that, Smith asked Kenneth B. Phillips to return the promissory note, marked paid. Kenneth B. Phillips

9

refused, continuing to insist that more was due for late fees, default interest, and his own fees. (Smith Dec., ¶ 44.)

Part of the collateral for the loan was a mortgage on land in Vermont that the Marcias owned. Baytree had assigned the mortgage to Back Bay in connection with the secret purchase of the loan in 2009. The Marcias were forced to sell the land in 2013. (Working for free for so many years had depleted Marcias' savings.) Kenneth B. Phillips refused to discharge the mortgage unless the full amount he claimed was due (including substantial legal fees he purportedly was owed) was paid. Ultimately, following motion practice in the Superior Court, over $70,000 of the proceeds of the Marcias' sale were placed in Kenneth B. Phillips's IOLTA account as a condition to the mortgage discharge, and the land was sold. In connection with the counterclaims in the Superior Court action, Kenneth B. Phillips was compelled to produce documentation of the fees he claimed were owed. The records he produced to substantiate the claimed fees are, to put it mildly, unprofessional. (Smith Dec., ¶¶ 45-46, Ex. C.)

**The Lawsuit (continued)**

Phillips and Finnegan's Superior Court action proceeded generally as follows. The parties conducted extensive discovery in 2010, but limited to Finnegan and Phillips's claims. Discovery and proceedings on the counterclaims, including for breach of fiduciary duty involving, among other things, the Back Bay purchase of the Baytree loan, were stayed. (Smith Dec., ¶ 48.) After discovery closed, Finnegan and Phillips changed their theory of the case via an amended (actually, second amended) complaint. Baker, Marcia, and Smith moved for summary judgment, which was denied principally based on claims by Finnegan and Phillips that the price at which Marcia and Smith converted their debt to equity was invalid – claims that were

10

categorically false – as Judge Lauriat and a jury subsequently found.  On the eve of trial, Phillips and Finnegan, then represented by a new law firm, rolled out a suite of new arguments designed to invalidate the conversions and holdings.  (Smith Dec., ¶¶ 49-50.)

Phillips and Finnegan's claims were tried to Superior Court Judge Lauriat, without a jury, over the course of 25 days in April through June 2011.  Kenneth B. Phillips was a witness at that trial, due to his role as manager of Back Bay ventures.  During the trial, Marcia and Smith both testified that they were not being paid by the Company.  Phillips was in the courtroom during this testimony.  (Smith Dec., ¶¶ 51-53.)

In November 2011, while the case was still under advisement with Judge Lauriat, Phillips filed a separate action in the Court of Chancery of the State of Delaware (the "Delaware Action") against Marcia and Smith.  Kenneth B. Phillips was co-counsel in this Delaware action.  The core claim in the Delaware Action was that the Board from March 2009 onward consisted not of Baker, Marcia, Finnegan, and Smith, but Baker, Marcia, Finnegan, Phillips, and Percia, i.e., a Board consisting of the aligned majority of Finnegan, Phillips, and Percia.  This claim was directly contrary to numerous sworn allegations, assertions, and admissions by Phillips and Finnegan in the Massachusetts Superior Court action; inconsistent with theories espoused in the Superior Court; contrary to the position Finnegan and Phillips adopted in avoiding not only the demand requirement of Rule 23.1, but also summary judgment; and inconsistent with many of their claims in the Superior Court action.  It was also directly contrary to sworn testimony by both Phillips and Finnegan and with practice at the Company from April 2009 until November 2011.  (Smith Dec., ¶¶ 54-56.)

11

After being served in the Delaware Action, Baker, Marcia, and Smith immediately filed with the Superior Court an emergency motion for a preliminary injunction.  In the motion, Baker, et al., demonstrated the identity between the issues that were under advisement with Judge Lauriat and the claims in Delaware, and argued that the Delaware Action was an end run in different claims' clothing.  They argued that the Delaware action sought, through a slightly different approach, the same result – control of VBenx – that Phillips and Finnegan had been pursuing for over two years, via varying and inconsistent approaches.  They cited case law holding that the courts in Massachusetts are empowered to enjoin parties over whom they have jurisdiction from pursuing related foreign proceedings.  (Smith Dec., ¶ 57.)

The very next day, and in a clear attempt to avoid the jurisdiction of the Superior Court, an amended complaint was filed in Delaware, with Phillips removed as the plaintiff (but Kenneth B. Phillips still as counsel) and Mrs. Finnegan added as the plaintiff in his stead.  After receiving the amended complaint in Delaware, Baker, et al., filed an amended emergency motion for a preliminary injunction in Massachusetts.  On December 5, 2011, Judge Lauriat heard argument on the motion.  The judge asked Finnegan and Phillips's counsel and Kenneth B. Phillips whose idea it was to file the Delaware action.  Counsel had no response.  Finnegan and Phillips's counsel acknowledged that some of the relief sought in Delaware would overlap with the relief sought in the Superior Court, and, if granted, would affect the Superior Court action.  Judge Lauriat characterized the two cases not as "parallel litigation," but, rather, as "the same litigation."  At a subsequent hearing, Judge Lauriat made a similar observation.  (Smith Dec., ¶¶ 58-60.)

12

Nevertheless, "Karen Finnegan" continued to pursue the duplicative Delaware action, a case that was premised on a claim concerning Board composition that was false and contrary to numerous sworn statements, allegations, admission, theories, and claims by Finnegan and Phillips.  Ultimately, and after extensive and expensive additional motion practice, Judge Lauriat joined Karen W. Finnegan as a party to the Superior Court action (over her claims that he lacked jurisdiction of her) and enjoined the pursuit of the Delaware action.  He explicitly stated that the Delaware action was an attempt at a second bite at the apple.  "Mrs. Finnegan" sought interlocutory review of Judge Lauriat's decision.  Review was denied.  "Mrs. Finnegan" then attempted to amend her husband and Phillips's Second Verified Amended Complaint, a year after trial, so that she could assert the board-composition claim that is contrary to fact.  "She" actually argued that Phillips and Finnegan had done a poor job of pursuing their claims.  Judge Lauriat denied the motion.  (Smith Dec., ¶¶ 61-62 .)

On October 18, 2012, Judge Lauriat decided Phillips and Finnegan's (and "Mrs. Finnegan's") claims, issuing "Findings of Fact, Rulings of Law and Order for Entry of Judgment," 77 pages worth.  Judge Lauriat found and ruled against Finnegan, Phillips, and Karen W. Finnegan on three of the four counts of the operative complaint and dismissed the fourth as moot.  Judge Lauriat included critical comments concerning Phillips.  (Smith Dec., ¶¶ 63-65, Ex. D, Ex. D at 5-6.)

On August 14, 2015, the Massachusetts Appeals Court affirmed Judge Lauriat's decision in all respects.  (Smith Dec., ¶ 68.)

Defending against Phillips and Finnegan's claims adversely affected the Company's operations in 2010 and especially in 2011.  Senior management were distracted, and this was a

13

substantial contributing factor to the decision by Kyle Fabrizio, a critical Company employee who had been responsible for landing virtually all major accounts in preceding years, to resign in early 2011.  All this harmed the business and caused the Company to lose sales.  (Smith Dec., ¶ 69.)

**The Shareholder Dispute – Chapter 3 (The Counterclaims)**

Discovery on Smith, et al.'s counterclaims was stayed until Judge Lauriat ruled, opened after his decision, and was stayed again while the appeal was pending.  It was completed in 2016.  (Smith Dec., ¶ 70.)

The counterclaims, winnowed via motion and various evidentiary rulings, were tried to a jury, Judge Kaplan presiding, in the Business Litigation Session of Suffolk Superior Court, in late May of this year.  (Smith Dec., ¶ 71.)[3]  The trial was preceded by a pre-trial conference on May 6, 2017.  Back Bay Ventures, LLC, was a party to one of the counterclaims that potentially was to be tried.  Kenneth B. Phillips was its counsel and over time had appeared for it at hearings.  Yet, he did not appear for the pre-trial conference.  There was discussion at the conference about whether the counterclaim against Back Bay was to be tried (it eventually was determined that it would not be), about whether Kenneth B. Phillips needed to be present for trial, and about his dual roles as manager of and attorney for Back Bay.  Judge Kaplan remarked,

> You know, Mr. Phillips is the principal of Back Bay Ventures.  He struck me as somebody who doesn't usually go to court very much and he decided to be the lawyer for Back Bay Ventures.  He's going to deal with that himself.  That's his problem.  That's not my problem.  And it's certainly not the Plaintiff's problem.  That was the bed that he made for himself, and he'll deal with it as best he can under the circumstances.
> * * * *

---

[3] Yet another law firm represented Phillips and Finnegan at trial.

19747769v.1

And Mr. Phillips has chosen not to be present at the final trial conference.  I have very little sympathy for whether Mr. Phillips finds himself in a predicament because he's both counsel for and essentially the principal of Back Bay Ventures that Mr. Phillips has to deal with.  There's an argument that his failure to appear here on behalf of his client would be enough for me to enter a default judgment against Back Bay Ventures and just declare now that there's nothing due on that note [the Baytree/Back Bay loan note], but I'm not going to do that although I think I'd be justified in doing that.

(Smith Dec., ¶ 72, Ex. E.)

The trial began on May 17, 2017.  Tried simultaneously with the counterclaims, but to Judge Kaplan rather than the jury, was Smith, et al.'s claim under Chapter 231, Section 6F, of the Massachusetts General Laws, in which an award of fees is sought based on Phillips and Finnegan's pursuit of claims that were frivolous and in bad faith.  Judge Kaplan has not decided that claim yet.  (Smith Dec., ¶ 73.)

The jury, however, did decide.  Three claims were submitted to the jury:  (1) a claim that Finnegan breached his fiduciary duties as Chairman by secretly purchasing and exerting pressure via the Baytree loan and by other means, and by pursuing a lawsuit based on knowingly false core allegations; (2) a claim that Phillips had aided and abetted Finnegan in those breaches; and (3) a malicious prosecution claim against Phillips and Finnegan based on their false – and malicious – claims.  The jury found for Smith, et al., and against Finnegan and Phillips on all three claims, and, on the first two claims, awarded more in damages than had been sought.  The jury found, specifically, that Phillips had aided and abetted Finnegan's breach of fiduciary duty and was guilty of malicious prosecution.  (Smith Dec., ¶¶ 74-77.)

Judgment on the verdict entered.  Judge Kaplan denied Finnegan and Phillips's post-judgment motions for a new trial or judgment notwithstanding the verdict.  Finnegan and Phillips have appealed.  (Smith Dec., ¶¶ 78-80, Ex. F.)

15

Under the judgment, including interest to date, Phillips owes Baker, Marcia, the Company, and Smith approximately $1.55 million.  Furthermore, under the indemnification and advancement provisions of the Company's charter and by-laws, and Delaware law, the Company has advanced, principally to Finnegan, nearly $700,000 in legal fees and expenses purportedly incurred in defending against the counterclaims.  Given their loss at trial and the basis for the loss (among other things), the Company is reasonably confident that most of this money (presumably including interest [at 12%, bringing the total up to approximately $800,000]) will have to be repaid.  (Smith Dec., ¶¶ 81-82.)

**Phillips's Awareness Of The Liberty Mutual Litigation**

Phillips was deposed in the CFN/Vbenx litigation with Liberty Mutual that is referenced in his complaint in this matter.  He was well aware of the dispute with Liberty Mutual by early 2014, at the latest.  (Smith Dec., ¶ 83, Ex. G.)

**Phillips's Infliction Of Harm**

While professing to represent VBenx's interest now, Phillips has done nothing but harm the Company since 2009.  As found by the jury, he pursued frivolous, bad faith litigation, in Massachusetts and in Delaware, costing the Company nearly $1 million in legal fees and disrupting its business.  His behavior with respect to Harvard was unconscionable.  He has not contributed a dime to the Company, nor provided any sort of support whatsoever.  His claim in this case that he is representing the interests of the Company is counter-factual.  (Smith Dec., ¶¶ 84-85.)

In fact, he has an ulterior motive.  Phillips learned of the Liberty Mutual situation in 2014, at the latest.  He learned of the settlement with Liberty Mutual almost a year ago.

16

Yet, it was not until judgment entered against him – a judgment he so richly deserved – that he brought this action.  (Smith Dec., ¶¶  83, 87.)  This case is all about leverage.[4]

And it is wrong.  Marcia and Smith did not breach their duties, and, under Phillips's own theory, the Company was not harmed due to the Liberty Mutual dispute, as the settlement agreement, which Phillips has seen, makes clear.  (Smith Dec., ¶ 89.)

**Kenneth B. Phillips's Lack Of Qualifications**

Kenneth B. Phillips is not qualified, experienced, or able to conduct this litigation.

(Chaffin Dec., ¶¶ 1-27, Exs. A-F.)

<u>Argument</u>

<u>PHILLIPS SHOULD BE DISQUALIFIED</u>

Rule 23.1(a) of the Federal Rules of Civil Procedure provides, in part:

> [A] derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association.

To determine whether a would-be derivative plaintiff "fairly and adequately represent[s] the interests of shareholders," a number of factors are considered, including

(1)   Economic antagonism between the representative and the class;

(2)   Other litigation pending between the plaintiff and the defendants;

(3)   The relative magnitude of the plaintiff's personal interest in matters beyond the scope of the derivative action, as compared to his or her interest in the derivative action;

(4)   The plaintiff's vindictiveness towards the defendants; and

(5)   The degree of support the plaintiff receives from the other shareholders that he or she purports to represent.

---

[4]   It is also about animus.  One time, Phillips stooped to referring to Smith, in writing, as an "evil dwarf."  (Smith Dec., ¶ 88, n.1, Ex. H at 2.)

19747769v.1

*Moore's Federal Practice* §23.1.09 (citing extensive authority).  In addition, "the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation." *Id.*

*G.A. Enterprises, Inc. v. Leisure Living Communities, Inc.*, 517 F.2d 24 (1st Cir. 1975), is illustrative on the first three factors listed above.  There, the would-be derivative plaintiff and the defendant were parties to other litigation in which they had obtained relief against one another.  The district court dismissed the derivative suit, concluding that the plaintiff was not a fair and adequate representative.  The First Circuit affirmed, concluding that the record demonstrated an obvious conflict of interest and outside interests on the part of the would-be plaintiff that outweighed its stake in the derivative suit.  The court wrote,

> [The would-be plaintiff's] interests, or at least the interests of its principal, suggest that from its standpoint the "highest and best" use of the derivative suit would be as a weapon in [the total arsenal of the principal of the would-be plaintiff], to be pursued, de-emphasized, or settled as the future course of the larger claims might dictate.  Since the suit threatens [the defendant's] managers with individual liability, it provides leverage that could affect how doggedly they pursue [the defendant's] own claims and defenses [against the principal] in other areas.   So manipulated, the derivative suit would serve interests beyond and perhaps contrary to those of the other minority shareholder.

517 F.2d at 26.

So here.  Given that Phillips's share of the Company is a mere 2%, that the amount of the judgment against him thus far exceeds any possible benefit to him from this action, and that he filed this action only after judgment against him entered (and not when he learned of the Liberty Mutual dispute in 2014 or when he learned of the Liberty Mutual settlement a year ago), it is apparent that this case is all about leverage with respect to the judgment against him.  The risk that this case will be used not for its

18

ostensible purpose, but to help Phillips drive a better bargain on the judgment against him, disqualifies him.  *Id.*; *see also Chesterton v. Chesterton*, 1990 U.S. Dist. LEXIS 13136 (D. Mass. 1990) (recognizing dismissal appropriate where antagonistic outside financial entanglements outweigh stake in derivative action; plaintiff's antagonistic interest and inability to muster other shareholder support disqualified him).

The case for disqualifying Phillips is stronger than were the cases against the would-be derivative plaintiffs in *G.A. Enterprises* and *Chesterton.*  Here – in addition to the antagonism, conflict, and lack of support that disqualified the plaintiffs in those cases – there is clear evidence of vindictiveness, seen in writings by Phillips, his pursuit of bad faith litigation for six years, and the timing of the initiation of this action.

Further, here, the would-be derivative plaintiff's counsel is not "qualified, experienced, and generally able to conduct the proposed litigation."  Phillips's counsel – his son – does not appear to have experience in cases like this, and, if he were to stay true to the form he demonstrated in the other litigation, he would not properly handle the demands of this litigation.  Phillips has asserted serious claims against Smith and Marcia, and Defendants should not be subjected again to the pattern of ignored pleadings and discovery requests, missed deadlines, ignored emails and phone calls, and unintelligible writings that marked Kenneth B. Phillips's representation of Back Bay.

**Conclusion**

For the foregoing reasons, Phillips should be disqualified.

Dated:  October 5, 2017                    WALTER SMITH and PETER MARCIA,

By their attorneys,

/s/Melissa Nott Davis
David B. Chaffin (BBO #549245)
Melissa Nott Davis (BBO #654546)
WHITE AND WILLIAMS LLP
101 Arch Street, Suite 1930
Boston, MA 02110
T:  (617) 748-5200
F:  (617) 784-5201

chaffind@whiteandwilliams.com
davism@whiteandwilliams.com

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those non-registered participants (if any) on October 5, 2017.

/s/Melissa Nott Davis
Melissa Nott Davis

20